RENDERED: AUGUST 24, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2021-SC-0485-MR

MICHAEL ROBERTSON                                            APPELLANT

<div align="center">

ON APPEAL FROM DAVIESS CIRCUIT COURT
HONORABLE JAMES A. WETHINGTON, JUDGE
NO. 20-CR-00641

</div>

V.

COMMONWEALTH OF KENTUCKY                                 APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A Daviess County jury convicted Michael Robertson of two counts of rape in the first degree. Robertson was sentenced to twenty years in prison. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Daviess Circuit Court.

## I. BACKGROUND

In August of 2019, A.C.[1] and her brother, E.C., lived with their mother, Keeley Robertson (Keeley), and her husband, Michael Robertson (Robertson). On August 13, 2019, Robertson brought A.C. to the doctor due to a rash on her legs and her private area. According to A.C., who was nine years old at the

---

[1] We use initials to identify the minors in this case to protect their privacy.

time, Robertson told her not to wear any panties to the doctor's office because the doctor would need to check her private area. The doctor determined A.C.'s rash was caused by poison ivy and gave her a prescription for a steroid. The doctor did not give her any medicine while she was at the office. Upon leaving the doctor's office but while still in the parking lot, Robertson gave A.C. Benadryl pills.

Robertson and A.C. then left the doctor, unsuccessfully tried to pick up A.C.'s prescription, and went to a fast-food restaurant. At the restaurant, A.C. got a milkshake while Robertson got a soda. After leaving the restaurant, Robertson brought A.C. to Sylvia Walters's house. A.C. had become very sleepy and groggy, and Robertson wanted Walters to check on A.C. Walters was a medical assistant in a urology office in the local hospital. Walters determined that A.C. was not in need of urgent medical attention, and Robertson and A.C. left.

While driving home from Walters's house, A.C., who was sitting in the front passenger seat, laid back and rolled over, telling Robertson she was going to go to sleep because she was feeling tired. After this, Robertson pulled A.C.'s dress up to her chest. He then inserted his finger into her vagina. A.C. remained still. Robertson then dripped soda on A.C.'s legs and inserted his finger into her vagina again. Again, she remained still. A.C. testified that she never actually fell asleep.

When they arrived back at home, A.C. acted like she was waking up and went inside. Keeley testified that when A.C. arrived home, A.C. was extremely

2

groggy and had difficulty walking and standing up by herself. A.C. took a shower and then went to bed. She did not tell Keeley what Robertson had done to her.

On September 2, 2019, A.C. first disclosed what Robertson had done. A.C. first told her father's girlfriend's daughter, A.R., who was a couple of years older than A.C. A.R. and A.C. then told A.R.'s grandmother's sister, Cheryl. Then A.C. told A.R.'s grandmother, Vicki. Then A.C. told her father's girlfriend, Angela. Angela told A.C.'s father, Tyler Stanley, and eventually A.C. also disclosed to her father what had happened. Stanley then confronted Robertson, and later that evening, A.C. and her brother began living with Stanley.

During the investigation into the above-described events, A.C. underwent a physical examination by a doctor and a forensic interview at the Children's Advocacy Center (CAC). During her forensic interview, A.C. stated that Robertson inserted his finger into her vagina three times. Based on this, Robertson was indicted on three counts of rape in the first degree. At trial, A.C. only testified to the two incidents described above, and thus, the trial court granted Robertson a directed verdict on one count of rape. The jury eventually found Robertson guilty of two counts of rape in the first degree and recommended a sentence of twenty years in prison. The trial court imposed this recommended sentence, and Robertson appealed to this Court.

## II. ANALYSIS

Robertson alleges numerous errors by the trial court and urges this Court to reverse his convictions. First, he alleges that the trial court misapplied

3

Marsy's Law by allowing Stanley to remain in the courtroom prior to his testimony. Second, he alleges the trial court erred by allowing the Commonwealth to refer to A.C. as the "victim" during the trial. Third, Robertson alleges that the trial court erred by allowing Stanley to improperly bolster A.C.'s credibility. Fourth, he argues that the trial court erred when it allowed a doctor to testify to the legal definition of rape. Fifth, he asserts that the trial court erred when it allowed the CAC interviewer to testify to improper impeachment evidence. Sixth, he argues that the trial court erred when it allowed a detective to read directly from notes about Robertson's interview which were prepared by the prosecutor. Seventh, Robertson argues that the Commonwealth's Attorney improperly inserted himself as a witness during the detective's testimony. Finally, he urges this Court to reverse his convictions because of cumulative error. We address each of Robertson's arguments in turn.

**A. The trial court did not misapply Marsy's Law.**

Robertson first argues that the trial court misapplied Marsy's Law by allowing Stanley, as A.C.'s representative under Marsy's Law, to remain in the courtroom prior to his testimony. Robertson asserts that this violated his right to the presumption of innocence, his right to confrontation, and his right to have witnesses separated. The parties disagree about whether this issue was waived, and if it was not waived, whether it was properly preserved for our review. However, we need not definitively determine whether the issue was waived or preserved because it is clear the trial court did not err.

4

Under Marsy's Law, a crime victim "as defined by law" has a constitutional right to be "present at the trial and all other proceedings, other than grand jury proceedings, on the same basis as the accused." KY. CONST. § 26A. Under Kentucky Revised Statute (KRS) 421.500(1)(a), "[i]f the victim is a minor . . ., 'victim' also means one (1) or more of the victim's . . . parents . . . which shall be designated by the court . . ." Conversely, under Kentucky Rule of Evidence (KRE) 615, "At the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." As we acknowledged in *Cavanaugh v. Commonwealth*, "KRE 615 and Section 26A of the Kentucky Constitution conflict with each other." No. 2021-SC-0441-MR, --- S.W.3d ---, 2022 WL 17726279, *2 (Ky. Dec. 15, 2022). However, we have also consistently held that "constitutional rights prevail over conflicting statutes and rules." *Commonwealth v. Barroso*, 122 S.W.3d 554, 558 (Ky. 2003).

In *Cavanaugh*, we explained that "in the event an application of Marsy's Law should violate a defendant's federal constitutional rights, then the Court would be compelled to remedy such a violation." 2022 WL 17726279, at *2 (citing U.S. CONST. art. VI, cl. 2). In that case, *Cavanaugh* was unable to "point to any authority stating KRE 615 is constitutionally required and is unable to point to any prejudice caused by the trial court permitting [the victim] to remain in the courtroom." *Id.* The same is true here.

Robertson argues that "[i]nherent in the [constitutional] right to confront witnesses against him is the right to confront those witnesses in a manner that

5

allows him to test the veracity of their testimony." Although it is true that "[t]he purpose of KRE 615 is to prevent a witness's testimony from being influenced by the testimony of other witnesses," *Spears v. Commonwealth*, 448 S.W.3d 781, 788 (Ky. 2014) (citation omitted), it is not necessary to the constitutional right to confrontation. There is no explicit constitutional right to separation of witnesses, and Robertson has cited to no caselaw finding a right to separation of witnesses within the Confrontation Clause of either the United States or Kentucky constitutions. Further, Robertson's presumption of innocence was not violated by the trial court's designating Stanley as a representative of the victim under Marsy's Law, as the trial court did not identify him as such in front of the jury.

Finally, Robertson can show no "prejudice caused by the trial court permitting [Stanley] to remain in the courtroom." *Cavanaugh*, 2022 WL 17726279, at *2. Stanley was the third witness to testify, after A.C. and Sylvia Walters. He had no direct knowledge of A.C.'s interactions with Robertson or with Walters. As such, the testimony of those two witnesses was unlikely to influence Stanley's testimony. Further, Robertson could have cross-examined Stanley regarding the effect the previous testimony had on his own, but did not. Accordingly, the trial court did not err in allowing Stanley to remain in the courtroom before he testified.

Although there was no prejudice in this case, that may not be true in every case. Today, we are constrained to hold as we do by the language of Marsy's Law. However, we are ever mindful that "[t]he purpose behind the

6

separation of witness rule is to insure the integrity of the trial by denying a witness the opportunity to alter his testimony." *Reams v. Stutler*, 642 S.W.2d 586, 589 (Ky. 1982) (citing *Commonwealth, Dep't of Highways v. Riley*, 414 S.W.2d 883 (Ky. 1967)). Because the integrity of the trial process is exceedingly important, we take the opportunity today to briefly set forth best practice for when this issue arises in the future.

Both the defense and the Commonwealth should consider in their trial preparations whether a conflict may arise between Marsy's Law and KRE 615. If there is an anticipated conflict, the parties should bring it before the court pretrial. At that time, the trial court should conduct a hearing at which the parties can discuss the potential conflict, and the Commonwealth can put forth its proposed order of witnesses and the basic substance of the victim's testimony. With that information, the trial court should, to the best of its ability, determine the impact of the conflict on the proposed testimony of the victim. Then the court should determine if, in the interest of maintaining the integrity of the trial, a different order of Commonwealth witness presentation is mandated. We trust trial courts to use their discretion in making these determinations to help ensure as fair a trial process as possible, within the parameters of Marsy's Law.

## B. The trial court did not err by allowing the Commonwealth to refer to A.C. as the "victim" during trial.

Robertson next argues that the trial court erred in allowing the Commonwealth to refer to A.C. as the "victim" during the trial. He asserts that this violated his presumption of innocence and invaded the province of the

7

jury. Robertson acknowledges that we have previously held that a trial court did not abuse its discretion in allowing the Commonwealth to refer to the victims in that case as "victims." *Whaley v. Commonwealth*, 567 S.W.3d 576, 590 (Ky. 2019). He, however, asserts that *Whaley* was wrongly decided and urges us to overrule it.

In *Whaley*, we noted that it would be "cumbersome and untenable" for the Commonwealth to refer to Whaley's accusers as "alleged victims." *Id.* We further held that

> [i]dentifying this group of children [as victims] in no way constituted a judgment as to the identity of the perpetrator of these crimes. This reference to the children as victims would not be unduly prejudicial. In fact, it would be no more so than the reading of the indictment listing the charges against Whaley.

*Id.* We also noted that the statutory sections outlawing sexual abuse, the crimes with which Whaley was charged, all "refer to the subject child as a victim." *Id.*[2] The same is true in this case, as KRS 510.040, the statute which defines Rape in the first degree, refers to the person upon whom the crime is committed as the "victim." We see no need to revisit our holding in *Whaley*. Accordingly, the Commonwealth's references to A.C. as the "victim" did not invade the province of the jury or violate Robertson's presumption of innocence, and the trial court did not abuse its discretion in allowing the Commonwealth to refer to her in such a way.

---

[2] We now note that only KRS 510.110, defining Sexual Abuse in the First Degree, includes the word "victim." The other two statutes referred to in *Whaley*, KRS 510.120 and 510.130, do not include the word "victim."

8

## C. The trial court did not err in admitting Tyler Stanley's testimony.

Robertson next argues that the trial court erred in allowing Stanley to improperly bolster A.C.'s testimony by saying that he wanted to make sure A.C. was telling the truth before confronting Robertson. Specifically, Stanley testified,

> I wanted to make sure that what had happened was true. . . . I wanted to let her know that I was going to confront Michael [Robertson] about the things that were said. So, I wanted to make sure that I was potentially getting in trouble for a real problem, not hearsay.

Following this testimony, Stanley testified that he then had a friend drive him to Robertson's house to confront Robertson. Robertson argues that through this testimony, Stanley "indirectly vouched for the truth of A.C.'s statement by implying that he found her so credible that he was willing to risk imprisonment to confront Michael [Robertson] over the allegations." This allegation of error was properly preserved by a pretrial motion in limine as well as a contemporaneous objection.

We review the trial court's decision to admit evidence for abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

"It is well-settled that a witness cannot vouch for the truthfulness of another witness. . . . [T]his rule applies even when a witness *indirectly* vouches for the truth of the victim's statement." *Hoff v. Commonwealth*, 394 S.W.3d

9

368, 376 (Ky. 2011) (citations omitted). In this case, it is unclear what exactly Stanley meant when he said that he "wanted to make sure that what had happened was true." Because he followed this statement up by explaining that he wanted "to make sure" he was not acting based on "hearsay," one reasonable interpretation of this testimony is that he wanted to hear the allegations directly from A.C. herself. Before speaking to A.C., he had only been told by Angela that A.C. had disclosed to Angela that Robertson had sexually assaulted A.C. If Stanley's testimony was only that he wanted to make sure A.C. had actually said the things that Angela told him she had said, then Stanley was not vouching for the truth of A.C.'s allegations at all.

Another reasonable interpretation of Stanley's testimony, however, is that he wanted to speak to A.C. directly so that he could gauge her demeanor and determine for himself if she was being truthful. If this was the meaning of his testimony, then his later testimony that he confronted Robertson about the allegations indirectly indicates that he, in fact, believed A.C. was telling the truth in her accusations against Robertson. This would be improper vouching.

There are two reasonable interpretations of the evidence at issue, one of which consists of admissible testimony and one of which consists of inadmissible testimony. Because either interpretation would have been a reasonable conclusion for the trial court, we cannot say that the trial court's decision to admit the evidence was "unreasonable." *See Goodyear Tire & Rubber Co.,* 11 S.W.3d at 581. Thus, the trial court did not abuse its discretion

10

in admitting this evidence. However, to the extent the testimony was improper, any error in its admission was harmless.

### D. The trial court did not commit palpable error by allowing a doctor to testify regarding the legal definition of rape.

Robertson next argues that the trial court erred in allowing Dr. Jennifer Lisle, a pediatrician and physician with the CAC, to testify to the legal definition of rape. We review the trial court's decision to admit evidence for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted). Robertson acknowledges this alleged error is unpreserved, however, and requests palpable error review under Kentucky Rule of Criminal Procedure (RCr) 10.26.

As relevant to this case, "[a] person is guilty of rape in the first degree when . . . [h]e engages in sexual intercourse with another person who is incapable of consent because he . . . [i]s less than twelve (12) years old." KRS 510.040(1)(b)2. "'Sexual intercourse' means sexual intercourse in its ordinary sense and includes penetration of the sex organs of one person by any body part or a foreign object manipulated by another person. Sexual intercourse occurs upon any penetration, however slight; emission is not required." KRS 510.010(8). The word "penetration" is not defined in Kentucky statutes.

During the Commonwealth's direct examination of Dr. Lisle, the Commonwealth's Attorney asked her if she was "familiar with Kentucky's definition of sexual intercourse." She responded, "I think so." The Commonwealth's Attorney then said, "As far as penetration however slight?" Dr. Lisle responded, "Yes, anything that goes past the labia." The Commonwealth's Attorney then switched the focus of his questioning to A.C.'s

11

lack of injuries and whether this was consistent with the history that A.C. provided.

Robertson then began his cross-examination of Dr. Lisle. During this cross-examination, Robertson focused heavily on the difference between touching and penetration, both medically and legally. He referenced the questions asked by the Commonwealth's Attorney to which he now objects and on at least three other occasions referenced the "legal distinction" or "legal difference" between touching and penetration.

On re-direct examination, Dr. Lisle explained the different anatomical parts that make up a female's genital area. She then stated, "Penetration from the medical standpoint, and I think from the legal standpoint is..." Robertson then objected arguing that Dr. Lisle was not qualified to give the legal definition of penetration. The trial court reminded Robertson that he questioned Dr. Lisle about the legal distinction between touching and penetration on cross-examination. The trial court ultimately instructed the parties to "try to keep her away from the legal issue" while acknowledging that "her understanding of the forensics is crucial." Robertson did not request any further clarification of the ruling or any remedy such as an admonition.

As re-direct examination continued, the Commonwealth asked Dr. Lisle about the definition of penetration "from a medical standpoint." Robertson continued this line of questioning on re-cross examination. Finally, on re-re-direct, the Commonwealth read the statutory definition of sexual intercourse and asked Dr. Lisle to define "the sex organ," which she did without objection.

12

As previously explained, we review the trial court's decision to admit evidence for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581.

On cross-examination of Dr. Lisle, Robertson elicited much of the evidence about which he now complains. Any alleged error in the admission of the testimony elicited on cross-examination is not merely unpreserved, but instead is invited error. A party is estopped from asserting an invited error on appeal. *Gray v. Commonwealth*, 203 S.W.3d 679, 686 (Ky. 2006) (citations omitted). "We have often held that a party is estopped to take advantage of an error produced by his own act." *Wright v. Jackson*, 329 S.W.2d 560, 562 (Ky. 1959) (citation omitted). An appellate court will not review actions that "reflect the party's knowing relinquishment of a right." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011) (citing *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)). Thus, we will not review the evidence that was admitted during Robertson's cross-examination of Dr. Lisle.

The only other evidence admitted from Dr. Lisle regarding a legal definition of penetration occurred towards the beginning of her testimony, during the Commonwealth's direct examination. As described above, Dr. Lisle testified that under Kentucky's definition of sexual intercourse, "penetration

13

however slight" meant "anything that goes past the labia."[3] Because this Court has held numerous times that "a witness generally cannot testify to conclusions of law," the admission of this testimony was in error. *Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky. 1998) (citing *Gibson v. Crawford*, 259 Ky. 708, 722, 83 S.W.2d 1, 7 (1935)). In fact, this Court has a difficult time envisioning a situation, other than potentially in a legal negligence case, in which a witness would be qualified to testify to the legal definition of a word used in a statute. This is so for two primary reasons. First, generally, words in a statute are given their "plain and ordinary meaning." *Ky. Occupational Health & Safety Comm'n v. Estill Cnty. Fiscal Ct.*, 503 S.W.3d 924, 929 (Ky. 2016). Second, the duty to instruct the jury on the law rests solely with the trial court. However, because this error was not preserved, we review it for palpable error.

Under RCr 10.26,

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"An error is 'palpable[]' only if it is clear or plain under current law. . . . Generally, a palpable error 'affects the substantial rights of a party' only if 'it is more likely than ordinary error to have affected the judgment.'" *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009) (citations omitted). Finally, manifest injustice is found only where, after consideration of the record, the

---

[3] We acknowledge that although this definition may be accurate medically, the medical definition is not at issue today.

defect alleged was "shocking or jurisprudentially intolerable" and where "the error seriously affected the 'fairness, integrity, or public reputation of the proceeding.'" *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006) (citations omitted). "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.* at 3. When we engage in palpable error review, our "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Baumia v. Commonwealth*, 402 S.W.3d 530, 542 (Ky. 2013) (quoting *Martin*, 207 S.W.3d at 5).

In this case, the admission of testimony from Dr. Lisle that penetration was "anything that goes past the labia" was not so serious that it "affected the 'fairness, integrity, or public reputation of the proceeding.'" *Martin*, 207 S.W.3d at 4. Robertson, in fact, sought to capitalize on this testimony during his cross-examination. He emphasized that because Dr. Lisle knew there was a legal distinction between touching and penetrating, her notes that A.C. told her that Robertson only "touched" her were significant. Further, while this testimony was relevant to the lesser-included offense of sexual abuse, Robertson's defense at trial was complete innocence. If the jury members had believed his version of events, then they would have found him not guilty of committing any offense, and this testimony would have had no bearing on their determination. Accordingly, we hold that the improper admission of testimony from Dr. Lisle of the definition of penetration did not rise to the level of palpable error warranting reversal of Robertson's convictions.

15

### E. The trial court did not err in admitting testimony from the CAC interviewer.

Robertson next argues that the trial court erred in admitting testimony from the CAC forensic interviewer, Jamie Hargiss, of statements A.C. made to Hargiss during her forensic interview. At trial, Robertson objected to Hargiss's testimony arguing it improperly bolstered A.C.'s credibility, as the statements to which Hargiss testified were prior consistent statements made by A.C. To this Court, Robertson argues that Hargiss's testimony was improper impeachment, asserting that A.C. acknowledged her prior inconsistent statement to Hargiss during her trial testimony. Robertson argues that because A.C. acknowledged her prior inconsistent statement, Hargiss was not permitted to testify to the inconsistent statement. He further asserts that "[b]ecause impeachment was not a proper purpose for this testimony, the testimony reverts merely to being impermissible hearsay" and only served to improperly bolster A.C.'s credibility.

The parties disagree as to whether this alleged error was properly preserved. However, we need not determine whether it was in fact properly preserved, as the trial court did not err in admitting Hargiss's testimony.

At trial, A.C. testified to two instances when Robertson inserted his finger into her vagina, despite having told Hargiss that it happened three times. The Commonwealth, during its direct examination of A.C., then sought to impeach her with her statements to Hargiss. The trial court instructed the Commonwealth to use a "soft impeachment" style with A.C. The following exchange then occurred.

16

Commonwealth (CW): Do you remember talking to a lady?

A.C.: No.

CW: Or a video of you talking to somebody else?

A.C.: Yes.

CW: And did you tell that lady it happened at least three times?

A.C.: I think. I think it happened like two or three times.

The next day, the Commonwealth called Hargiss to testify. After Hargiss told the jury that she was employed by the CAC and explained what the CAC is, Robertson objected. The bench conference that ensued was a bit unusual. As noted above, Robertson objected on the grounds that Hargiss's testimony would improperly bolster A.C.'s credibility by repeating a prior consistent statement. The Commonwealth then explained that it believed Robertson would likely want Hargiss to testify as to A.C.'s prior **inconsistent** statement. The Commonwealth went on to say that Hargiss had other forensic interviews scheduled, and the Commonwealth wanted to call her to testify during its case-in-chief so that she could be released from her subpoena and return to work. The trial court then ruled that Hargiss could testify to her credentials and how many times A.C. told Hargiss that Robertson had touched her, but that Hargiss could not "get into all of the details" or testify to A.C.'s prior consistent statements. Robertson then objected to Hargiss testifying to all of her qualifications, as Robertson did not believe they were necessary if Hargiss was only testifying for impeachment purposes. The trial court overruled that objection.

17

Hargiss then testified that A.C. told her that Robertson put his finger in her vagina three times on the same day over a short period of time. She further testified that A.C. told her this occurred on the car ride home from a doctor's appointment. She said that A.C. told her they stopped at a friend's house, that A.C. thought the friend was a nurse, and that the touching occurred after leaving the friend's house, on the way home. Finally, Hargiss testified that A.C. specifically stated that Robertson used his index finger. Robertson did not object again during Hargiss's testimony and did not cross-examine her.[4]

Under KRE 802, hearsay is generally inadmissible. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801. Under KRE 801A, however,

> [a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is . . . [i]nconsistent with the declarant's testimony.

Under KRE 613,

> [b]efore other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it.

---

[4] We note that some of this testimony repeated A.C.'s prior consistent statements in violation of the trial court's ruling during the bench conference. However, because Robertson does not argue this to our Court, we will not review whether admission of the prior consistent statements was erroneous.

Robertson argues that "[i]mplicit in this rule is the understanding that if a witness is inquired of concerning the prior statement and admits the prior statement was made, the impeachment ends." He seems to assert that A.C. acknowledged her prior inconsistent statement to Hargiss and that because of this acknowledgement, Hargiss's testimony was improper. We review the trial court's decision on this issue for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted); *Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011) (citation omitted).

We have previously held that a "trial judge has considerable discretion in determining whether testimony is 'inconsistent' with prior statements; inconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position." *Meece*, 348 S.W.3d at 672 (quoting *United States v. Dennis*, 625 F.2d 782, 795 (8th Cir. 1980)). In this case, A.C. could not remember "talking to a lady" about what Robertson did to her but could only remember a video of her "talking to somebody else." Further, when asked if she told "that lady it happened at least three times," A.C.'s answer was less than certain. She replied, "I think. I think it happened like two or three times." The trial court was fully within its discretion to find that this testimony was "inconsistent" with her unequivocal statement to Hargiss that Robertson had touched her three times. Therefore, Hargiss's testimony was proper impeachment through use of a prior inconsistent statement. Accordingly, the trial court did not err in admitting Hargiss's testimony.

## F. The trial court did not err in admitting Detective Jared Ramsey's testimony.

Robertson next argues that the trial court erred in allowing Detective Jared Ramsey to read directly from notes prepared by the Commonwealth's Attorney about Robertson's interview. Robertson asserts this violated both KRE 612 and 803(5). We review the trial court's admission of this evidence for abuse of discretion. *English*, 993 S.W.2d at 945 (citation omitted).

During Detective Ramsey's testimony, the Commonwealth asked the detective about his interview with Robertson. Before asking Detective Ramsey to describe the substance of the interview, the Commonwealth asked Detective Ramsey if he had taken notes about the interview, if he had the notes with him, if the notes would refresh his memory about the interview, and if the notes would assist him in communicating to the jury what was said during the interview. Detective Ramsey answered in the affirmative to each of these questions. Robertson interjected and asked if the notes were made contemporaneously with the interview or in preparation for trial. Both Detective Ramsey and the Commonwealth answered that the notes were made in preparation for trial. Robertson then asked for a copy of the notes, which the Commonwealth provided to him. The Commonwealth then asked Detective Ramsey if he had compared the notes to the recorded interview and if the notes were accurate. Detective Ramsey stated that he had compared the notes to the recorded interview and that the notes were consistent with the interview. He then began describing the interview.

20

Less than two minutes into Detective Ramsey's testimony about the interview, Robertson objected. Robertson argued both that the notes were in the Commonwealth's Attorney's handwriting and that Detective Ramsey was reading from them verbatim. During the bench conference on this objection, the trial court first ordered the Commonwealth to take the notes away from Detective Ramsey and only provide them to him if he needed them. However, after further discussion in which Robertson and the Commonwealth explained that they both believed there were portions of the recorded interview which were inadmissible, the trial court changed its ruling and ordered that Detective Ramsey could, in fact, read from the notes verbatim.

Detective Ramsey then continued to describe his interview with Robertson. Sometimes he testified without looking at the notes at all, sometimes he merely glanced at the notes while testifying, and sometimes he looked at the notes for an extended period while testifying. It is unclear whether Detective Ramsey was reading from the notes verbatim during this testimony because the notes were not made a part of the record on appeal.

Robertson objected again, arguing that Detective Ramsey was not testifying but instead was merely reading from the Commonwealth's Attorney's notes and that his testimony was in narrative form without any questions being posed to him. The trial court overruled this objection but ordered the Commonwealth to try to direct Detective Ramsey to answer questions.

Detective Ramsey then continued describing his interview with Robertson. He eventually began looking at the notes for an extended period

while testifying and could have possibly been reading from them, but again, it is unclear to this Court. Robertson again objected on the basis that Detective Ramsey's testimony was narrative without any questions being asked. During the bench conference on that objection, the parties again discussed with the trial court that the video of the interview was not being played because there were inadmissible portions. Robertson again argued that Detective Ramsey was reading the notes verbatim. The trial court then asked Robertson what the remedy would be if it sustained his objection. Robertson stated, "It might be a mistrial" because he could not test the detective's memory. The trial court then stated that it sustained Robertson's objection and ordered the Commonwealth to take the notes away from Detective Ramsey.

Before testimony resumed and after further conversation at the bench, Robertson admitted that the notes from which Detective Ramsey was reading accurately portrayed the interview but that they were not verbatim from the interview. The trial court then changed its ruling again to allow Detective Ramsey to read questions and answers from the notes. Robertson informed the trial court that the notes were not in a question-and-answer format. Finally, the trial court stated,

> I'm not going to make a record based on a transcript that is not in evidence. Now, if you want to put it into evidence, I will have to stop this proceeding, review the transcript, and give you a ruling. Otherwise, I can't control how [the Commonwealth's Attorney] presents his case.

The Commonwealth then agreed to move on, and Detective Ramsey continued testifying. Robertson did not make the notes a part of the trial court record nor

are they a part of the record on appeal. However, after the Commonwealth closed its case-in-chief, Robertson moved for a mistrial based on the detective's reading of the notes verbatim.

In attempting to review this allegation of error, this Court faces the same problem faced by the trial court. Because the notes are not a part of the record for us to review, we cannot tell if or how much Detective Ramsey read from the notes. On cross-examination, Detective Ramsey stated that he paraphrased "quite a bit" but that there "are only so many ways to say" some of the things that Robertson said during the interview. Detective Ramsey also stated that some of the statements to which he testified were "actual comments made by" Robertson that Detective Ramsey specifically remembered.

It is clear from the record that the Commonwealth intended to use the notes to refresh Detective Ramsey's memory under KRE 612, the present memory refreshed rule.

> For a witness's memory to be refreshed under this rule, the offering party must show that "the witness once had personal knowledge of the event about which testimony is sought and . . . the witness's memory of that event needs to be revived." This rule codifies the common-law rule allowing any writing to be used to refresh a witness's memory if necessary. True to its name, when a witness refreshes her memory under this rule, the testimony elicited thereafter "is the product of the refreshed memory, not the writing used to refresh it." As a result, the document itself is not admissible into evidence, and the hearsay rule does not apply.

*Martin v. Commonwealth*, 456 S.W.3d 1, 14–15 (Ky. 2015), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227 (Ky. 2022) (footnotes omitted). The Commonwealth laid the foundation required by the rule and did not seek to admit the notes into evidence. *See id.* at 15. This is in contrast to

23

what the Commonwealth would have been required to do if it sought to admit

Detective Ramsey's testimony under KRE 803(5), the past recollection recorded

rule.

> For admission under this rule to be appropriate, the offering party must show the writing was made or adopted by the witness as an accurate reflection of personal knowledge the witness once possessed, and the witness no longer adequately remembers the matter to fully and accurately testify. If this test is met, the recording, which need not be a writing, may be read into the record as substantive evidence but may not be introduced as an exhibit unless offered by the adverse party.

*Id.* (footnotes omitted). KRE 803(5) sets a higher foundational requirement

which the Commonwealth did not even attempt to meet in this case.

If Detective Ramsey had read from the notes verbatim, this could have

been a violation of KRE 612, as the notes should have only been used to

refresh his recollection. However, without the notes in the record for our

review, we cannot determine if or how much he read from the notes. Further,

this Court "will not engage in gratuitous speculation . . . based upon a silent

record." *Commonwealth v. Thompson*, 697 S.W.2d 143, 145 (Ky. 1985). *See also*

*Chestnut v. Commonwealth*, 250 S.W.3d 288, 304 (Ky. 2008) (citing *Thompson*,

697 S.W.2d at 145) ("[W]e are bound to assume that the omitted record

supports the decision of the trial court."). Accordingly, we hold that the trial

court did not abuse its discretion in allowing Detective Ramsey's testimony.

### G. The Commonwealth's Attorney did not improperly insert himself as a witness.

Robertson next argues that the Commonwealth's Attorney violated his

ethical duties by improperly inserting himself as a witness during Detective

24

Ramsey's testimony. Robertson argues that the Commonwealth's Attorney did this in two ways: first, by asking Detective Ramsey if he and Detective Ramsey had prepared notes on Robertson's interview together; and second, by noting during Detective Ramsey's testimony that he was with Detective Ramsey when Detective Ramsey timed the likely routes Robertson would have driven on the day in question. Robertson asserts that this questioning placed the credibility of the Commonwealth's Attorney in front of the jury and served to bolster the validity of Detective Ramsey's testimony. Further, he asserts that his right to a fair trial under the Due Process Clause of the Fifth Amendment to the United States Constitution was violated by the Commonwealth's Attorney's actions. Robertson acknowledges this alleged error was not preserved and requests palpable error review.

Robertson argues that the Commonwealth's Attorney improperly inserted himself as a witness when he elicited testimony from Detective Ramsey that they had worked together to prepare the notes on Robertson's interview. This testimony came during the Commonwealth's re-direct examination of Detective Ramsey. The Commonwealth did not elicit this information during its direct examination of Detective Ramsey. In fact, Robertson was the first to inform the jury that the notes Detective Ramsey used during his testimony were in the Commonwealth's Attorney's handwriting.

Robertson began his cross-examination of Detective Ramsey by asking if the notes were in his handwriting. Detective Ramsey admitted that they were not. Upon further questioning, Detective Ramsey acknowledged that he had

made only a few little notes and that the vast majority of the notes themselves were made by the Commonwealth's Attorney. Thus, Robertson himself was the first to bring this information to the attention of the jury. Therefore, to the extent that Detective Ramsey's further testimony on re-direct examination could have been error, it was invited error. "We have often held that a party is estopped to take advantage of an error produced by his own act." *Wright*, 329 S.W.2d at 562 (citation omitted). Thus, Robertson is estopped from asserting this alleged error, and we will not review it.

Robertson next argues that the Commonwealth's Attorney improperly inserted himself as a witness by noting through his questioning that he was with Detective Ramsey when Detective Ramsey timed the likely routes Robertson would have driven on the day in question. Specifically, after Detective Ramsey testified that the driving distance from Meijer, where Robertson tried to pick up A.C.'s prescription, to Sylvia Walters's house was 3.3 miles and took about 7 minutes and 55 seconds, the Commonwealth's Attorney asked, "You drove it, and I was with you?" Then he asked, "You did the calculations?" Detective Ramsey answered affirmatively to both of those questions. Detective Ramsey then described the route from Walters's house to the house where Robertson, A.C., and Keeley lived. The Commonwealth's Attorney then asked, "How long did that take you, or us?" Detective Ramsey then answered that it took about 8 minutes and 45 seconds and was 4.8 miles.

Under Kentucky Rule of Professional Conduct (SCR) 3.130(3.4)(e), "[a] lawyer shall not . . . in trial, . . . assert personal knowledge of facts in issue

26

except when testifying as a witness." Robertson cites to *Holt v. Commonwealth*, 219 S.W.3d 731 (Ky. 2007), to support his position that the Commonwealth's Attorney violated this rule.

In *Holt*, the Commonwealth called a witness who had been incarcerated with the defendant to testify. *Id.* at. 733. When the witness did not testify consistently with a statement he had previously given to the Commonwealth, the Commonwealth sought to impeach him with his prior statement. *Id.* In doing so, the Commonwealth's Attorney asked questions such as: "Do you remember talking with me this morning?"; "Do you remember telling me that he told you that he did it?"; "So, you don't recall ever telling me that the defendant in this case told you that he robbed that trailer?"; "Do you remember telling me that the defendant told you that [he put certain evidence] in his mom's garage?"; and "But you're now saying that you don't recall telling me that the defendant told you that he put them in his mom's garage?" *Id.* at 733–34. By asking these questions, the Commonwealth's Attorney "asserted on at least four occasions that [the witness] told her that Appellant had admitted the crime." *Holt*, 219 S.W.3d at 734. The Commonwealth did not call any other witness to impeach that witness's testimony, and the impeachment was done entirely through the Commonwealth's cross-examination. *Id.* In doing so, the Commonwealth's Attorney took "such broad liberties in the mode of examination as to essentially give testimony as to the substance of the prior statement." *Id.* at 733. We held that "assertions of fact from counsel as to the content of prior conversations with witnesses have the effect of making a

27

witness of the lawyer and allowing his or her credibility to be substituted for that of the witness," and we reversed Holt's conviction. *Id.* at 737.

We addressed a similar issue in *Fisher v. Commonwealth*, 620 S.W.3d 1 (Ky. 2021). In *Fisher*, the Commonwealth called a detective to testify to the information contained in a discovery log in order to show that another witness could not have obtained the knowledge he had about the crime from reviewing the discovery materials provided to the defendant. *Id.* at 12. The detective did not have "personal knowledge or memory of the specific discovery timeline," and the Commonwealth had to "resort[] to highly suggestive and leading questionings during direct examination." *Id.* at 12–13. We explained that by doing this, "[t]he Commonwealth's Attorney was feeding a witness facts beyond the witness's personal knowledge through leading questions and gestures." *Id.* at 14. We held this was error, albeit not reversible in that case. *Id.* at 15.

The Commonwealth's questioning of Detective Ramsey in the case at bar is of a different kind than that found to be error in *Holt* and *Fisher*. In this case, the Commonwealth's Attorney did not "give testimony" or "feed[] a witness facts beyond a witness's personal knowledge." *Holt*, 219 S.W.3d at 733; *Fisher*, 620 S.W.3d at 14. Instead, the Commonwealth's Attorney merely noted his presence with Detective Ramsey as Detective Ramsey drove the routes he thought Robertson may have taken on the day in question. This does not amount to error, and certainly is not palpable error.

**H. There is no cumulative error.**

Finally, Robertson argues his conviction should be reversed due to cumulative error. Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth,* 313 S.W.3d 577, 631 (Ky. 2010). "Where, as in this case, however, none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth,* 95 S.W.3d 34 (Ky. 2002)). In this case, the only potential error we have identified is the CAC interviewer's testimony as to the legal definition of rape. That potential error alone did not render Robertson's trial fundamentally unfair, and there are no other errors to accumulate. Accordingly, we hold there was no cumulative error in this case.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Daviess Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Matthew Robert Krygiel
Assistant Attorney General